UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           v.<br><br>DARRYL D. WILLIAMS,<br><br>                    **Defendant.** | Criminal Action No. 91-559-6 (TFH) |

**MEMORANDUM OPINION**

Before the Court is Defendant Darryl D. Williams' Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). For the reasons that follow, Mr. Williams' motion will be granted, and he will be resentenced.

### I.      Background

In 1983, at the age of fourteen, Darryl Williams joined a violent neighborhood gang known as the "R Street Crew." The gang was made up of Mr. Williams' relatives and friends, most of whom lived on or near R Street in Northeast Washington, D.C. *United States v. Williams-Davis*, 90 F.3d 490, 494 (D.C. Cir. 1996). Led by Mr. Williams' cousin, the R Street Crew trafficked large quantities of narcotics and engaged in violent, and sometimes deadly, conflict with rival drug gangs in Northeast Washington, D.C. throughout much of the 1980s and early 90s. *Id.* Eventually, Mr. Williams became "a leader" of the gang and "supervis[ed] a wide array of lieutenants, second lieutenants, runners, packagers, stash house owners, and others." *Id.* at 498. Mr. Williams was also involved in the gang's violence. In 1985, at the age of 16, Mr.

Williams shot and killed Alton Clea during a dispute between the R Street Crew and a competing gang. *Id.*

In September of 1991, a federal grand jury returned a 115-count Superseding Indictment charging Mr. Williams and 23 co-defendants with violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) ("RICO"), conspiracy to violate RICO, 18 U.S.C. § 1962(d), and drug conspiracy, 21 U.S.C. § 846, among other serious charges. Superseding Indictment [ECF No. 115]. Darryl Williams and three co-defendants were also charged with operating a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848 *et seq.* Given the notoriety of the gang at the time, the case attracted significant press coverage and was "the first attempt by the United States Attorney to use federal racketeering laws against a neighborhood drug gang in the District of Columbia." *United States v. Williams-Davis*, 821 F. Supp. 727, 731 (D.D.C. 1993).

In 1992, after a lengthy jury trial, Mr. Williams was convicted of *inter alia*: (1) operating a continuing criminal enterprise, in violation of 21 U.S.C. § 848; (2) conspiracy to distribute and possess with intent to distribute illegal drugs, in violation of 21 U.S.C. § 846; (3) second-degree murder while armed, in violation of D.C. Code § 22-2403; (4) employment of a minor in a narcotics trafficking offense, in violation of 21 U.S.C. § 861; and a number of other counts related to drug distribution and possession. Gov't Opp'n to Mot. for Compassionate Release at 2 [ECF No. 2353].

In May of 1993, Judge George Revercomb sentenced Mr. Williams to a mandatory sentence of life without parole on the CCE charge, Count 4. Mot. for Compassionate Release [ECF No. 2347] at 4. 18 U.S.C. § 848(b) imposes a sentence of mandatory life without parole for engaging in a continuing criminal enterprise if the defendant (1) is a "principal administrator,

organizer, or leader of the enterprise"; and (2) the enterprise "involved at least 300 times the quantity of a substance described in subsection 841(b)(1)(B)." 18 U.S.C. §§ 848(a), (b)(1)-(2). At sentencing, the Court accepted the findings of the Presentence Report as to drug quantity, finding that the combined drug weight – 150 kilograms or more of cocaine, 30 kilograms or more of PCP, and 1.5 kilograms or more of cocaine base – was equivalent to about 1,100,000 kilograms of marijuana. Darryl Williams Sentencing Hr'g Trans. [ECF. No. 1423] at 4; PSR ¶ 41-42 [ECF. No. 2353-1]. The Court therefore sentenced Mr. Williams to the statutorily mandated sentence of life without parole. His conviction and sentence were affirmed by the D.C. Circuit on direct appeal in 1996, and the Supreme Court denied certiorari. *See United States v. Williams-Davis, et. al*, 90 F.3d 490, 514 (D.C. Cir. 1996), *cert. denied*, 519 U.S. 1128 (1997).

On December 31, 2020, Mr. Williams moved for compassionate release, arguing that he should be released because he is 52 years old and suffers from multiple medical conditions including high cholesterol (hyperlipidemia) and low white-blood cell count (leukopenia) and the (previously) severe COVID-19 outbreak at FCI Cumberland where he is incarcerated. Mot. for Compassionate Release at 3. Mr. Williams further maintains that, in addition to his health concerns, he is entitled to compassionate release for a variety of other reasons, most notably because (1) were he sentenced today, he would not have received a mandatory sentence of life without parole due to changes in federal sentencing and constitutional law; (2) his sentence was based on conduct which occurred as a juvenile and is therefore unconstitutional under the Supreme Court's decisions in *Miller* and *Montgomery*; (3) at the time of the offense he was (and remains) mentally disabled; and (4) he has shown remarkable rehabilitation. *Id.*; *Miller v. Alabama*, 567 U.S. 460 (2012); *Montgomery v. Louisiana*, 577 U.S. 190 (2016).

3

The government opposes his motion, arguing that neither his health conditions nor any other reason warrant a sentence reduction. Gov't Opp'n at 2.

**II.     Legal Standard**

Prior to the First Step Act, the statute authorizing compassionate release, the Comprehensive Crime Control Act of 1984 gave the Bureau of Prisons ("BOP") exclusive control over all compassionate release motions. Only the director of the BOP could file a motion for compassionate release. *See* Pub. L. No. 98-473, 98 Stat. 1837, 1998-1999 (1984). Pursuant to that statute, if the BOP director files a motion on behalf of a defendant the court may reduce a defendant's term of imprisonment if "extraordinary and compelling reasons warrant" a sentence reduction and such a reduction is "consistent with applicable policy statements issued by the Sentencing Commission." *Id.* The applicable policy statement is found in the U.S. Sentencing Guidelines Manual (U.S.S.G.) at Guideline § 1B1.13, which contains "Application Notes" setting forth four narrow circumstances that qualify as "extraordinary and compelling." U.S.S.G § 1B1.13.

"For more than three decades, the statute left the Director of the Bureau of Prisons in 'absolute control over this mechanism for lenity[.]'" *United States v. Long*, 997 F.3d 342, 348 (D.C. Cir. 2021) (quoting *United States v. Brooker*, 976 F.3d 228, 231 (2d Cir. 2020)). In 2018, "displeased with [the] desuetude" of compassionate release, Congress, via the First Step Act, made significant changes to the statute with the explicit goal of increasing grants of compassionate release. *Id.*; *see also United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020) ("Section 603(b) of the First Step Act announces its purpose in its title – 'Increasing the Use and Transparency of Compassionate Release'" ); *United States v. Jones*, 980 F.3d 1098, 1104 (6th Cir. 2020) ("Frustrated with the BOP's conservative approach, a bipartisan coalition in Congress

sought to boost grants of compassionate release by reforming § 3582(c)(1)(A)'s procedures in the First Step Act of 2018.").

Before Congress overhauled the compassionate release statute, a defendant had no recourse if the BOP declined to bring a motion on his behalf. Now, under the provision of the Act entitled "Increasing the Use and Transparency of Compassionate Release," a defendant may file a motion for compassionate release directly with the Court, so long as they first request relief from the BOP. In short, Congress "remove[d] the Bureau of Prisons from its former role as a gatekeeper over compassionate release petitions." *McCoy*, 981 F.3d at 276.

Today, as amended, the compassionate release statute allows a court to modify a term of imprisonment "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

Despite the First Step Act's significant revision to the procedure for compassionate release, the relevant policy statements at U.S.S.G. § 1B1.13 have not been updated. Consequently, the D.C. Circuit, joining eight other Courts of Appeals, has held that "U.S.S.G. § 1B1.13, is not 'applicable' to defendant-filed motions for compassionate release under the First Step Act." *Long*, 997 F.3d at 355. A district judge therefore has discretion to "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *Brooker*, 976 F.3d at 237; *see also Jones*, 980 F.3d at 1111 ("In cases where incarcerated persons file motions for compassionate release, federal judges …have full discretion to define 'extraordinary and compelling' without consulting the

policy statement § 1B1.13"); *McCoy*, 981 F.3d at 284 ("district courts are empowered ... to consider *any* extraordinary and compelling reason for release that a defendant might raise") (internal quotation omitted).

Because Mr. Williams brings this motion on his own behalf, U.S.S.G. § 1B1.13 is not applicable. Accordingly, the question before the Court is whether Mr. Williams has articulated extraordinary and compelling reasons that warrant a sentence reduction in his case.

### III.   Analysis

#### A.   Ability of This Court to Grant Compassionate Release for Mr. Williams' D.C. Code Offense

Although the D.C. Circuit has never expressly addressed the issue, "a bevy of D.C. Circuit precedent… strongly suggests the Court may hear and rule on compassionate release motions under 18 U.S.C. § 3582(c)(1)(A) from prisoners like defendant, who were convicted and sentenced in this Court for D.C. Code offenses." *United States v. Hammond*, No. 02-CR-294 (BAH), 2020 WL 1891980, at *7 (D.D.C. Apr. 16, 2020); *see also United States v. Greene*, No. 71-CR-1913 (KBJ), 516 F.Supp.3d 1, 20 (D.D.C. Feb. 2, 2021) ("The bottom line is this: notwithstanding the fact that the federal district court previously sentenced [defendant] for both federal and local crimes…federal courts derive their sentencing authority from Congress under federal law, and, by their nature, compassionate release statutes dictate the criteria and procedures pursuant to which a federal court can modify a term of imprisonment that it previously imposed. Therefore, this Court is confident that *federal* standards govern its determination[.]").

The government does not contest Mr. Williams' assertion that this Court has the power to grant him compassionate release for the D.C. Code offense. Given the well-reasoned opinions of

other judges in this District and the government's non-opposition, this Court concludes that it, too, can decide Mr. Williams' motion as to both his federal and local convictions.

### B. Exhaustion of Administrative Remedies

On March 12, 2021, as reported by counsel, Mr. Williams submitted a written request for compassionate release to the warden of FCI Cumberland. Reply at 1 [ECF No. 2355].[1] More than thirty days having elapsed since Mr. Williams submitted that request, the defendant has satisfied the exhaustion requirement under § 3582(c)(1)(A).

### C. Extraordinary and Compelling Circumstances

Mr. Williams' case presents a unique combination of circumstances, which, considered together, are extraordinary and compelling and warrant a sentence reduction. First, given changes in federal sentencing and constitutional law, were he sentenced for the exact same conduct today, Mr. Williams would not have received a mandatory life without parole sentence. Second, because the sentencing Court was statutorily required to sentence Mr. Williams to life without parole, it could consider neither the fact that he joined the R Street Crew as an intellectually disabled fourteen-year-old from a violence and poverty-stricken neighborhood nor that more than half of his conduct occurred while he was a juvenile. That is, the sentencing Judge was unable to consider the "hallmark features" of youth nor determine whether his crimes "reflect[ed] unfortunate and transient immaturity" rather than "irreparable corruption." Third,

---

[1]      At the time he filed his initial motion, Mr. Williams had not submitted a request to the BOP but asserted that that the exhaustion requirement in § 3582(c)(1)(A) is subject to equitable waiver and should be waived in this case. Mot. for Compassionate Release at 16 n.17. The government took a contrary position. Gov't Opp'n at 1, 15-17. On April 14, however, the government notified the Court that it was withdrawing its argument that the defendant has failed to exhaust his administrative remedies because he submitted a written request to the warden of his institution. [ECF. No. 2363].

despite Mr. Williams' intellectual impairment and terminal sentence, he has demonstrated substantial and remarkable rehabilitation.

A number of courts, including those in this District, have granted compassionate release in similar circumstances. Courts have found extraordinary and compelling reasons to exist where defendants were serving lengthy sentences for offenses that today would result in considerably less severe sentences due to changes in the law, especially when taking into consideration a defendant's age at the time of offense. *See, e.g.*, *United States v. Price*, 496 F. Supp. 3d 83, 88 (D.D.C. 2020) (granting compassionate release to an inmate serving life because "the sentencing scheme in place in 2008 was, in this Court's words, 'draconian,' such that today a defendant similarly-situated to [the defendant] would face only a 15-year mandatory minimum"); *United States v. Kratsas*, DKC-92-0208, 2021 WL 242501, (D. Md. Jan. 25, 2021) (granting compassionate release to individual who received a mandatory life sentence for a drug offense that, after passage of the First Step Act, would require only a 15-year mandatory minimum sentence); *United States v. Day*, 474 F. Supp. 3d 790, 806 (E.D. Va. 2020) (finding extraordinary and compelling reasons where "were Defendant sentenced today…[i]nstead of a mandatory life sentence…Defendant would today face a mandatory minimum sentence of 15 years…with a substantially lower than Life Guidelines sentence").

### 1. The Drug Quantity Finding

Not all CCE convictions mandate a life sentence without the possibility of parole. Only those defendants who are both "leaders" of the conspiracy and who distributed extremely large quantities of drugs face the most severe term of imprisonment. 21 U.S.C. § 848(b). Mr. Williams was sentenced to life without parole because the Court, adopting the findings of the Probation Office, determined that the quantity of drugs attributed to the conspiracy as a whole met that

statutory threshold. Although permissible at the time, today Mr. Williams could not face a mandatory life without parole sentence based on a conspiracy-wide drug finding gleaned from a Presentence Report.

The Supreme Court has "repeatedly explained, any increase in a defendant's authorized punishment contingent on the finding of a fact requires a jury and proof beyond a reasonable doubt." *United States v. Haymond*, 139 S. Ct. 2369, 2379 (2019)(internal quotation omitted). In *Apprendi*, the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). And in *Alleyne*, the Supreme Court held that "[f]acts that increase the mandatory minimum sentence are [ ] elements and must be submitted to the jury and found beyond a reasonable doubt." *Alleyne v. United States*, 570 U.S. 99, 108 (2013). Therefore, as explained by the D.C. Circuit, "[a] district court [] errs when it applies a mandatory minimum based on a fact that was not found by the jury." *United States v. Stoddard*, 892 F.3d 1203, 1219 (D.C. Cir. 2018).

In *Stoddard*, the D.C. Circuit adopted the "individualized approach to drug-quantity determinations that trigger an individual defendant's mandatory minimum sentence," *id.* at 1221, holding that "in order for a defendant to be sentenced based on a mandatory minimum triggered by a certain quantity of drugs, a jury must find the drug quantity attributable to the defendant on an individualized basis, not just the drug quantity attributable to the conspiracy as a whole." *Id*. at 1208. Restated, a mandatory-minimum sentence based on drug quantity must be based on an *individualized* finding as to the quantity of drugs for which a particular defendant is responsible. In adopting the individualized approach, and vacating defendants' sentences based on a conspiracy-wide drug quantity finding, the Circuit emphasized that "[i]t is a core principle

of conspiratorial liability that a co-conspirator may be held liable for acts committed by co-conspirators during the course of the conspiracy only when those acts are 'in furtherance of the conspiracy' and 'reasonably foresee[able]' to the defendant." *Id.* at 1221. "Reasonable foreseeability shapes the outer bounds of co-conspirator liability, and it applies to drug quantities that trigger enhanced penalties just the same as it applies to other acts committed by co-conspirators." *Id.* (internal citation and quotations omitted).

Count Four of the Superseding Indictment charged that Mr. Williams, along with three co-defendants, was a leader of an enterprise involving 150 kilograms of cocaine, 30 kilograms of PCP and 1.5 kilograms of crack-cocaine. Superseding Indictment at 71-72 [ECF. No. 115]. At trial, the jury was instructed that the government had to prove beyond a reasonable doubt that "the enterprise was involved in distribution" of 150 kilograms or more of cocaine "and/or" 30 kilograms of PCP "and/or" 1.5 kilograms or more of crack. Jury Instructions at 93 [ECF No. 2365-2]. The Court instructed the Jury: "[I]n short you must find that the *enterprise* involved at least one of these amounts. The government does not have to prove all three; any one of these will suffice to prove this element." *Id.* (emphasis added). Consistent with those instructions, the verdict sheet for Count 4 did not require the jury to make specific findings as to as to quantity of drugs, which of the drugs met the charged quantities, or any specific defendant's responsibility for a particular quantity or type of drugs. Verdict Form [ECF. No. 2366-1]. The jury returned only a general verdict. *Id.*

At sentencing, the Court accepted the findings of the Presentence Report (which contained no individualized findings as to Mr. Williams) as to drug quantity weight, finding that the overall drug weight "comes to about 1,100,000 kilograms of marijuana…based primarily on the testimony of Mr. Buckwalter and Mr. Juggins, which the court and the jury found credible."

Williams Sentencing Hr'g Trans. at 4; PSR ¶ 41. Because that drug weight exceeded the threshold set forth under 18 U.S.C. § 848(b)(2)(A), the Court sentenced Mr. Williams to the statutorily mandated sentence of life without parole on Count 4.

*Alleyne* and *Apprendi* require that any fact used to determine mandatory sentences must be found by a jury beyond a reasonable doubt. *Stoddard* makes clear that a defendant's sentence must be based on an *individualized* determination of drug quantity. *Stoddard*, 892 F.3d at 1219. Mr. Williams' mandatory sentence did not comport with either of those dictates. Instead, he was sentenced to mandatory life based on a conspiracy-wide determination of drug quantity – a fact that was determined by the Court based on a PSR, not by a jury acting on proof beyond a reasonable doubt.

In *Stoddard*, the D.C. Circuit vacated defendants' sentences where the jury adopted the conspiracy-wide approach because "[h]ad the jury been properly instructed and given a proper verdict form, the outcome may well have been different." *Stoddard*, 892 F.3d 1222. That logic extends to Mr. Williams' case. In Mr. Williams' case, too, the outcome would almost certainly have been different. Had he had the benefit of *Alleyne, Apprendi* and *Stoddard*, to support a sentence of mandatory life the government would be required to prove, beyond a reasonable doubt, that Mr. Williams specifically was responsible for the entire quantity of drugs alleged in the indictment as attributable to the R Street Crew as a whole. Although he quite clearly faced, and deserved, a lengthy period of incarceration, it is implausible that were he sentenced today he would have faced a mandatory life sentence.

"Only a jury, acting on proof beyond a reasonable doubt, may take a person's liberty. That promise stands as one of the Constitution's most vital protections against arbitrary government." *Haymond*, 139 S. Ct. at 2373. That a defendant is sentenced without the benefit of

*Alleyne/Apprendi* or *Stoddard* does not in and of itself constitute an extraordinary and compelling circumstance. In this case, however, when combined with the defendant's youth and intellectual disability at the time of the offense, additional developments in sentencing law, and the terminal and mandatory nature of the sentence – that the defendant was sentenced to mandatory life because of a judge-determined, conspiracy-wide drug quantity no doubt constitutes an extraordinary and compelling reason warranting a sentence reduction.

**2. Mr. Williams' youth at the time of the offense**

In the 30 years since Mr. Williams was convicted, the Supreme Court has unequivocally articulated that "youth matters in sentencing." *Jones v. Mississippi*, 141 S. Ct. 1307, 1314 (2021). In *Graham v. Florida*, the Court held that the Eighth Amendment prohibits life without parole for nonhomicide offenses committed by juvenile offenders. 560 U.S. 48 (2010). In *Miller v. Alabama,* the Court held that a juvenile convicted of a homicide offense could be not sentenced to a mandatory life sentence without parole because "a lifetime in prison is a disproportionate sentence for all but the rarest children, those whose crimes reflect 'irreparable corruption.'" *Montgomery*, 577 U.S. at 195 (quoting *Miller*, 567 U.S. at 479–480).

In *Miller*, the Court recognized five "hallmark features" of youth which a sentencing Court is unable to consider when mandated to impose a sentence of life without parole. Those features include (1) "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) "family and home environment that surrounds [a juvenile defendant]—and from which [a juvenile defendant] cannot usually extricate himself—no matter how brutal or dysfunctional"; (3) the circumstances of the offense, including the role of the juvenile and the extent to which peer pressure was involved; (4) the incompetencies of youth that may have disadvantaged him in

dealing with the police or participating in the criminal proceedings; and (5) "possibility of rehabilitation." *Miller,* 567 U.S. at 477-78.[2]

Regardless of whether *Graham* makes Mr. Williams' sentence unconstitutional, in the context of evaluating whether extraordinary and compelling circumstances exist, the Court finds consideration of those five "hallmark features" of youth to provide a useful framework in evaluating Mr. Williams' situation.

Mr. Williams grew up in an impoverished neighborhood ravaged by crime and drug violence. He was just 14 years old when he joined the R Street crew, drafted into the gang by his older siblings and relatives. As the Court discussed in the cases of co-defendants Andre Williams (one of Darryl's older brothers) and McKinley Board, the juvenile members of the gang had little opportunity to avoid gang life given the involvement of their older relatives and siblings and the circumstances of their upbringing. *See* Board Hr'g Trans. at 26 [ECF. No. 2346]; Mot. for Compassionate Release at 7. Although Mr. Williams was certainly a willing and active participant in the gang's criminal activities, he was also subject to significant influence from older family members who led the gang. *C.f. Graham*, 560 U.S. at 68 ("As compared to adults, juveniles have a lack of maturity and an underdeveloped sense of responsibility; they are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure.") (internal citations and quotations omitted); *Miller* 470 U.S. at 471-72 ("children… have limited

___

[2]    Mr. Williams maintains that his mandatory life without parole sentence violates the Eighth Amendment because much of the criminal conduct that formed the basis for his sentence – that is, the quantity of drugs sold – occurred while he was a minor. Mot. for Compassionate Release at 3. The question of whether *Miller* and *Graham* categorically bar a mandatory life without parole sentence in "a case concerning a crime that straddled the age of majority" is an open question. *In re Andre P. Williams*, 759 F.3d 66, 70 (D.C. Cir. 2014). This Court is unaware of any other federal court to have addressed that precise issue. It is not, however, a question the Court need answer to evaluate the instant motion.

"contro[l] over their own environment" and "lack the ability to extricate themselves from horrific, crime-producing settings").

Moreover, Mr. Williams suffers from a relatively severe intellectual impairment. The original PSR reported that Mr. Williams had an IQ of 67, putting him in the "mildly retarded" range. PSR ¶ 120; Mot. for Compassionate Release at 23. At age 14, he reportedly could read only at a fifth-grade level. *Id*. A recent psychological report by Mr. Williams' expert, Dr. Sara Boyd, found that his current intellectual functioning was consistent with findings reported by the PSR. Boyd Report at 9 [ECF No. 2359]. Dr. Boyd found that Mr. Williams continues to function in "the borderline to extremely low ranges of verbal intellectual ability." *Id.* Youth alone elicits "immaturity, impetuosity, and failure to appreciate risks and consequences." *Miller,* 567 U.S. at 477. Greatly diminished intellectual function almost certainly exacerbates the callowness of youth.

Not only was Mr. Williams a youth with diminished intellectual capability growing up – surrounded by family members who encouraged law breaking and violence – he was the victim of sexual abuse at the hands of multiple older family members. As reported by Dr. Boyd, both his "his cognitive impairments as well as a history of abuse are both associated with lower psychosocial maturity in children and adolescents." Boyd Supplement at 4 [ECF No. 2359-1]. That the abuse happened at the hands of family members, and Mr. Williams became involved with criminal conduct with family members, is also significant in evaluating the circumstances of his offense.

Because it was bound to impose a mandatory life without parole sentence, the sentencing Court was unable to take into consideration mitigating facts about Mr. Williams' youth, the circumstances of his upbringing, his intellectual capacity, or his history of abuse (at the time

unknown to the Court). That the sentencing Court was unable to consider those "hallmark features" of youth, features likely exacerbated by his diminished intellectual function – despite the fact that much Mr. Williams' criminal conduct occurred while he was a minor – is, in this case, an extraordinary and compelling circumstance. In short, Mr. Williams' youth and intellectual function "diminish the penological justifications for imposing the harshest sentences" and, in conjunction with other factors discussed in this opinion, represent an extraordinary and compelling circumstance warranting a sentence reduction. *Miller*, 567 U.S. at 472.

### 3. The First Step Act

In addition to his constitutional arguments, Mr. Williams maintains that, due to changes made by the Fair Sentencing Act and the First Step Act, the amount of crack alleged in the Superseding Indictment would be insufficient today to support a mandatory life sentence under 21 U.S.C. § 848(b). Were he sentenced on the CCE count today, Mr. Williams argues he would be subject to a sentence of twenty years to life under subsection 848(a) – a markedly less severe sentence than mandatory life without the possibility of parole. Mr. Williams submits that this disparity in sentencing, created by the Fair Sentencing Act, constitutes an extraordinary and compelling reason for compassionate release.

Amongst other changes, the Fair Sentencing Act amended section 841(b) of the Controlled Substances Act by increasing the quantity of crack cocaine necessary to trigger mandatory minimums thereby reducing the disparity between the sentences for crack and cocaine from 100-1 to 18-1.  Pub. L. No. 111-220, 124 Stat. 2372 (2010). Specifically, Section 2 of the FSA "increased the drug amounts triggering mandatory minimums for crack trafficking offenses from 5 grams to 28 grams in respect to the 5–year minimum and from 50 grams to 280 grams in respect to the 10–year minimum." *Dorsey v. United States*, 567 U.S. 260, 269 (2012).

Subsequently, with the goal of "'rectify[ing] disproportionate and racially disparate penalties' in federal sentencing for crack and powder cocaine offenses," the First Step Act applied the Fair Sentencing Act's provisions retroactively to offenders who were sentenced before August 3, 2010. *United States v. Holmes*, No. CR 02-24, 2021 WL 1518336, at *4 (D.D.C. Apr. 16, 2021) (quoting *United States v. Boulding*, 960 F.3d 774, 782 (6th Cir. 2020)). Section 404(a) of the First Step Act allows a defendant to seek relief if they committed certain "covered offenses" defined as "a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act" committed prior to enactment of the Fair Sentencing Act. First Step Act, § 404(a). As the government has previously acknowledged in the case of Williams' co-defendant, McKinley Board, eligibility for a sentence reduction is determined by the statute of conviction, as charged in the indictment, not by specific conduct of the defendant. *See United States v. White*, 984 F.3d 76, 86 (D.C. Cir. 2020) ("[W]hether an offense is 'covered' does not depend on the actual drug amounts attributed to a defendant, whether by a judge or a jury. Rather, it depends only on whether the defendant was convicted of an offense with a statutory penalty range that the Fair Sentencing Act altered.").

By directly modifying the penalties for section 841(b)(1)(B), the Fair Sentencing Act changed the statutory penalties for 21 U.S.C. § 848(b)(2)(A) because it "effectively increase[d] from 1.5 kilograms to 8.4 kilograms the amount of crack required to trigger the mandatory life sentence imposed by § 848(b)." *United States v. Jimenez*, No. 92-CR-550-01 (JSR), 2020 WL 2087748, at *2 (S.D.N.Y. Apr. 30, 2020) (holding that defendant serving sentence for conviction under 21 U.S.C § 848(b) is "eligible for relief under the First Step Act" because he "has been serving a sentence for a 'covered offense'"). *See also United States v. Moore*, No. 95 CR 509-2, 2020 WL 4748154, at *3 (N.D. Ill. Aug. 17, 2020) (defendant sentenced under section 848(b) for

counts involving crack was eligible for reduced sentence under the First Step Act). Accordingly, Mr. Williams' CCE conviction constitutes a covered offense under the First Step Act.[3]

That Mr. Williams was convicted and sentenced based on a multi-drug conspiracy does not make him ineligible for relief under the First Step Act. *See United States v. Gravatt*, 953 F.3d 258, 264 (4th Cir. 2020). As this Court explained in the case of McKinley Board, adopting the reasoning articulated by the Fourth Circuit in *Gravatt*, a defendant convicted based upon a multi-drug distribution conspiracy is eligible under § 404 of the First Step Act provided that at least one of the drugs was crack cocaine, for which the statutory penalties had been modified by the Fair Sentencing Act. To find otherwise, this Court found, would "impose an additional limitation on the Act's applicability that is not in the statute." Board Hr'g Trans. at 16. Accordingly, Mr. Williams is eligible for First Step Act relief and resentencing despite the fact that the other drugs which formed the basis for his CCE conviction would today still meet the threshold triggering a mandatory life without parole sentence. Accordingly, in the First Step Act context, the Court could exercise its discretion and resentence Mr. Williams who would face a mandatory sentence of twenty years, and a guideline sentence short of life, under subsection 848(a).

As stated above, for Mr. Williams' conviction to result in mandatory life today, the government would have to prove, beyond a reasonable doubt, that all 150 kilograms of powder cocaine and 30 kilograms of PCP alleged in the indictment as attributed to the R Street Crew as a whole were personally attributable to him – an implausible outcome. If Mr. Williams were prosecuted today, he could still face a life sentence under 848(a), but the Court would not be

---

[3]     In the case of co-defendant Mr. Williams-Davis, who filed a First Step Act motion addressing a similar issue, the government has recognized that a violation of the CCE statute, for which the statutory penalties are triggered by reference to the drug quantities indicated in 21 U.S.C. § 841(b)(1)(B), is a covered offense. Mem. in Opp. to Kevin Williams-Davis' Mot. to Reduce Sentence [ECF. No. 2368].

compelled to sentence him to life. And the Court would take into consideration the mitigating

factors of his youth and intellectual disability. Especially for a man sentenced to life at age 23,

the disparity between mandatory life and a mandatory minimum of twenty years is – in

conjunction with the other factors discussed in this opinion –an extraordinary and compelling

circumstance warranting compassionate release.

### 4.  Substantial Rehabilitation

As a further factor warranting compassionate release, Mr. Williams recounts his

substantial progress towards rehabilitation despite his life without parole sentence. Mot. for

Compassionate Release at 4. Records submitted in support of his 28 U.S.C. § 2255 petition

indeed demonstrate Mr. Williams has taken advantage of a wide variety of prison programming

and has devoted a great deal of time to community service. *See generally* Exhibits In Supp. of §

2255 Petition [ECF. Nos. 2341 Docs. 1-16]. In particular, he has devoted significant effort to

working with at-risk youth through the nonprofit organization "Murder Free DC." William

Magruder Letter [ECF. No. 2341–8]. The CEO of the organization reports that Mr. Williams

"has made a huge impact on the lives of some of [Murder Free DC's] most high-risk

participants," because "[h]e holds nothing back in sharing his past mistakes and criminal

experience in hopes that they will not follow in his footsteps." *Id*. He also cites numerous letters

from family members and members of the community to demonstrate that he is a loving father

and brother and someone who has learned from his past mistakes and is ready to contribute

positively to society. Mot. for Compassionate Release at 9-11. Indeed, even Mr. Clea's brother

has written a letter in support of Mr. Williams' release.[4] [ECF. 2347-4]. Finally, the Court takes

---

[4]      The Court recognizes that the government has contacted other of Mr. Clea's siblings who
have indicated that they do not support release.

note of Mr. Williams' own words at the motion hearing and letter submitted to the Court as indicative of a man who has, over the last 30 years, changed dramatically. [ECF. No. 2340].

By itself, substantial rehabilitation does not constitute an extraordinary and compelling circumstance. However, when combined with the other factors discussed in this opinion, it is relevant. Mr. Williams' impressive rehabilitation, in the face of long odds and a terminal sentence, militates, once again, towards a finding that compassionate release is warranted in this case.

## IV.    Conclusion

Mr. Williams' case is unique. There is no question he engaged in destructive violent conduct, including a murder. But he engaged in the majority of that conduct, including the murder, as an intellectually disabled child and has now been incarcerated for over 30 years.  In granting this motion for compassionate release the Court is mindful of the Supreme Court's approach to juvenile sentencing, which has undergone dramatic changes since Mr. Williams was sentenced 30 years ago. In sum, the Court finds that in light of the changes in constitutional and statutory law that would have subjected Mr. Williams to a penalty short of mandatory life imprisonment were he sentenced today, extraordinary and compelling reasons exist warranting compassionate release and a sentence reduction.

In order to determine the appropriate sentence upon sentence reduction the Court will hold a resentencing hearing to properly evaluate the factors set forth in 18 U.S.C. § 3553. An appropriate order follows this opinion.

November 8, 2021

Thomas F. Hogan
SENIOR UNITED STATES DISTRICT JUDGE